FT. WORTH & D. C. RY. CO. v. ALLEN.
(No. 736.)

(Court of Civil Appeals of Texas. Amarillo. July 3, 1915. Rehearing Denied Oct. 9, 1915.)

1. CARRIERS ☞304 — PERSONS ASSISTING PASSENGERS—DUTY OF CARRIER—HOLDING TRAIN.

One entering a train, with the knowledge of the railroad company, to render necessary assistance to passengers in the interest of the company, does so by implied invitation, and the company must hold the train for a time reasonably sufficient to allow such person to render such assistance and leave the train.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1104, 1110–1114, 1124, 1242; Dec. Dig. ☞304.]

2. CARRIERS ☞304—PERSONS ASSISTING PASSENGERS—KNOWLEDGE OF CARRIER.

A carrier who has no knowledge that one is entering its train to assist passengers only, and with the intention of thereupon alighting, may assume that such person boards the train as a passenger, and may start the train after giving him a reasonable time to get aboard.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1104, 1110–1114, 1124, 1242; Dec. Dig. ☞304.]

3. CARRIERS ☞304—PERSONS ASSISTING PASSENGERS — STATEMENT TO BRAKEMAN — EFFECT.

Where one entering a train to assist his two daughters to a seat answered the brakeman's question as to destination by saying, "They are going to H.," the brakeman was not charged with knowledge that such person entered only to assist the others, and was intending to leave the train.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1104, 1110–1114, 1124, 1242; Dec. Dig. ☞304.]

4. CARRIERS ☞316—PASSENGERS—INJURIES—CUSTOM—EFFECT.

Where a custom exists for a railroad company to allow persons to enter its trains to assist passengers, and to hold trains a reasonable time for that purpose, plaintiff who entered a train for that purpose and was injured by jumping from the train, which started before he could get off, need not show knowledge by the company that he entered the train to assist passengers only, since the custom supplies such notice.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1261, 1262, 1283, 1285–1294; Dec. Dig. ☞316.]

5. CARRIERS ☞304—PERSONS ASSISTING PASSENGERS—CUSTOM—NEGLIGENCE.

Where it appeared, in an action for injuries received in alighting from a moving train, that plaintiff entered the train at a station to assist his daughters to a seat with the intention of thereupon leaving the train, but without knowledge of such intention on the part of the defendant company; that the company had no custom of holding its trains at such point to allow such assistance to passengers, but stopped only long enough for passengers to get on and off without regard to time—there was no negligence in failing to hold the train a reasonable time to allow plaintiff to perform the service and leave the train in safety.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1104, 1110–1114, 1124, 1242; Dec. Dig. ☞304.]

6. CARRIERS ☞336—PERSON ALIGHTING FROM MOVING TRAIN—STATEMENT BY BRAKEMAN —EFFECT.

Where plaintiff left the train, which he had entered only to assist passengers to get on board, as it was getting under way and while descending the steps of the coach told the brakeman that he was going to alight, the reply of the brakeman to "jump with the train" was no invitation or command by the company constituting the inducing cause to plaintiff to alight, as the direction was merely in the nature of information or advice.

[Ed. Note.—For other cases, see Carriers, Cent. Dig, §§ 1357–1362; Dec. Dig. ☞336.]

7. CARRIERS ☞304 — PERSON ALIGHTING FROM MOVING TRAIN—DUTY OF CARRIER.

The plaintiff having started down the coach steps without hesitation declaring his intention to alight and without asking that the train be stopped at a time when the train was getting under way, it was neither the company's duty to stop the train, nor to prevent his alighting until the train could be stopped; its only duty being to use ordinary care in permitting him to leave the train.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1104, 1110–1114, 1124, 1242; Dec. Dig. ☞304.]

8. CARRIERS ☞336 — PERSON ALIGHTING FROM MOVING TRAIN—ACT OF BRAKEMAN—EFFECT.

The fact that the brakeman gave plaintiff room on the car steps to pass was not an invitation to plaintiff to jump from the train.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1357–1362; Dec. Dig. ☞336.]

Appeal from District Court, Donley County; Jas. N. Browning, Judge.

Action by T. H. Allen against the Ft. Worth & Denver City Railway Company, to

recover damages sustained while alighting from a car. From a judgment for plaintiff, defendant appeals. Reversed.

Thompson & Barwise, of Ft. Worth (G. W. Wharton, of Ft. Worth, of counsel), and H. B. White, of Clarendon, for appellant. A. T. Cole, of Clarendon, and Odell, Turner & Powell, of Ft. Worth, for appellee.

HUFF, C. J. T. H. Allen, appellee, sued appellant for damages received by breaking his leg at Clarendon, a station of appellant on its line of road. It is alleged that appellee's two daughters and his granddaughter were desirous of boarding appellant's train at the station above named; that they had considerable baggage, and that for the purpose of assisting them, he boarded the train with them, carrying the luggage, and when they reached the seat intended for occupancy, the train began to move, and he sought to leave the train, and then he alleges the facts up to his fall. The negligence alleged is: (1) That it was the custom, and usual, to stop the train at the station five minutes, but on this occasion it only stopped two minutes and not longer than one minute after the employés permitted the passengers to enter; and it was negligent to start without remaining its customary time and without giving appellee an opportunity to seat the parties mentioned and to leave the car in safety. (2) It was negligent, when its servants learned that he desired to leave the train, in not bringing it to a standstill. (3) And for its servants to invite appellee to alight therefrom and tell him to jump with the train as it moved.

The trial court submitted two grounds of negligence:

(1) If appellant "negligently failed to cause said train to remain standing a reasonable length of time for plaintiff to accomplish his purpose and to disembark safely from the same, and you further believe from the evidence that the said servants and employés of defendant caused the said train to start before the same had stood a reasonable and sufficient time for plaintiff to safely alight therefrom in the exercise of ordinary care and diligence on his part, etc.; (2) or if you believe from the evidence that defendant's brakeman, by word or act, made it reasonably to appear to plaintiff that he was invited to leave the train at the time he did, and acting under such invitation," etc.

We find no allegation that appellee notified the servants of appellant that it was his purpose to assist his daughters to a seat and then disembark, and that he only boarded the car for that purpose, and that it was his intention to leave the train upon performing the service at the time he entered the car, or before he did so. The only allegation of notice given was after the train had started and just before he left the train, when it is alleged, as set out in ground (2) of negligence, when the servants learned he desired to leave the train, and in not bringing the train to a full stop. It will be observed this ground of alleged negligence was not submitted by the trial court.

The facts show that on the 21st of May, 1911, the appellee, with a married daughter and her little girl, and another daughter about 14 or 15 years old, went to the depot of appellant, for the purpose of taking the train to visit another daughter of appellee near Hedley, on defendant's line of road. They had one ordinary suit case and a folding baby buggy, which the married daughter was taking with her to present as a present to her sister living at Hedley. Appellee accompanied his daughters to the train for the purpose of putting them on the train. It is shown by the testimony that there were but few passengers who left the train or got on the train that morning; but as soon as the passengers getting off at that point had alighted, the appellee and his daughters boarded the train. He stated:

"My recollection is the coach we went on was attached to the smoker, up next to the front—that is my recollection. I did not notice how many there were. I got on where the passengers generally were getting on and off and where the others got on; that is the only place I noticed them getting on and off. * * * When the train stopped, as I said a while ago, we got to the train or depot just about the time the train slowed up, and I spoke to my daughter and said—well we walked up there and stopped and stood there until the passengers got off, and there was probably one in ahead of us, but as soon as we could get to the step we went on the train. * * * We walked right on down the aisle to the back end of the coach, I think right on the back end, where we found a vacant seat and stopped, and just about the time we got there I felt the train move, and I said to my daughter, 'I have got to get off.' I set the grip down and turned and walked back to the entrance. * * * I walked back to the platform and back on the platform of the car, and there was a brakeman standing on the lower step of the car, and I asked him if the train was going to stop at the coal chute, and he said 'No' and I said, 'I want to get off;' and I think that is the words I used as he walked up the steps and I walked down to the lower step and jumped off. He walked up and I down. I never heard anything else said at all, except just as I got on the lower step to get off I heard him—I suppose it was him—some one in the car said, 'Jump with the train.' * * * When I told the brakeman I wanted to get off he never said anything at all that I heard, except what I have told you. That is all that was said. I just asked him the question if he was going to stop at the coal chute, and he said, 'No,' and I said, 'I have got to get off.' Of course I had gone on there with the calculation of getting off and done that. I had went up there with the calculation of seating them and getting off. I do not think there was anything else said at all; nothing until I got on the step there. There was no one else on the platform at the time I stepped down the steps, except the brakeman, that I saw. The voice that said, 'Jump with the train,' came from about where the brakeman stood, * * * I just stepped down on the lower step and jumped off. When I jumped off I lit on my feet, and I fell. This leg gave way and I kind o' tumbled on that side and caught on my hand and tried to get up, and my leg gave way and I did not try any more."

On cross-examination he testified:

"I told my daughters as we got to the depot that I would not take the time to get the tickets; that they could pay on the train. We heard the train whistle of course before it came

in, but we got there just about the time it came in. * * * My recollection is that my daughters were in ahead of me, but now I would not be positive about that matter. We all were right together there, and I think they went in first. They were just going down to my daughter's to stay a few days on a visit. The brakeman was at the steps when we got there, and I think his name is Mr. Burnsides. I don't think my daughters said anything about where they were going. I don't think it is a fact that Mr. Burnsides asked me then where they were going and that I, or my daughters, said, 'Hedley.' I would not be positive about that. I do not think that is true. I did not tell him where we were going. I don't remember saying a word about that. * * * It seems that he just swung on there. He was right on the lower step, I asked him if the train would stop at the coal chute, and he said it would not, and I said, 'I have got to get off.' I think those were the words I used, and he never said a word. * * * He told me to jump with the train just about the time I hit the bottom step. You might say that I was just turning loose at the time he told me to jump with the train. * * * In jumping from the train my recollection is that I went out pretty near straight from it. I may have gone a little at an angle, but my memory is that I went mighty nearly straight. If jumping with the train means jumping the way it is going, I did not jump with the train. You might say I was in a hurry to get off. I did not want to go further. I wanted off as soon as I could get off. It is a fact that I was in a hurry to get off and from the time I came out and got on the vestibule and saw the brakeman there was no pause, but I kept on going. * * * I did not ask the brakeman to stop the train for me."

The brakeman, Burnsides, testified that he saw appellee and his daughters getting on the train at the time above mentioned.

"I first saw him at the station at Clarendon on the ground near the footstool at the front end of the rear coach. What we call the rear coach is the last coach day passengers ride in, ahead of the diner and two sleepers. Plaintiff came to the train to get on. I helped his folks on the train, and asked them where they were going, and they said, 'Hedley.' I suppose it was him and his two daughters. I took it to be his two daughters. I knew one was his daughter, and the other I did not know whether it was or not, The one that I knew was named Mrs. Robertson. The ladies got on the train first; there was one little child with them. I suppose we had been there some three or four minutes; that is as near as I can guess at that. There were not a great many passengers that got off the train at Clarendon at that time. When I asked Mr. Allen where he was going he was just getting up in the vestibule, and he said he was going to Hedley, and he went into the car with his folks. He said nothing else to me at that time. * * * The next time I saw Mr. Allen was after the train started and had gone a couple, or probably three car, lengths. He came out into the vestibule and said he was going to get off. He came out and said that, and I told him not to get off, that he might hurt himself, and to go to the conductor and he would let him off. He asked me if we would stop at the coal chute, and I told him that I did not know whether we would or not. He said, 'I am going to get off,' and he dropped off. During that conversation he was going down the steps. * * * Plaintiff just went down the steps and took the handrail with his right hand and stepped off backwards."

On cross-examination he stated:

"The only reason I remember Mr. Allen and what was said is because I asked Mr. Allen where he was going, and he said he was going to Hedley, and he said they were going to Hedley. I do not know whether he said 'we' or 'they.' I do not exactly know what he said about it. If I remember right Mr. Allen was in his shirt sleeves; it was Sunday. I did not know he was going to get off the train."

The facts show that Mr. Allen did not board the train with the expectation of going to Hedley or as a passenger, but only for the purpose of assisting his daughters. The jury returned a verdict in favor of the appellee for $5,000, and upon which judgment was rendered. The appellant requested the court to instruct a verdict for the appellant, which was refused. The action of the court in this particular is the ground for several assignments of error, which will now be noticed in order.

[1, 2] There is no evidence that we are able to find in the record that the appellee went into the train in conformity with the practice or custom at that station, approved or acquiesced in by the railroad; that is, to render necessary assistance to a passenger in the interests of the railway, and therefore an implied invitation. If one so enters, we understand the rule to be that under such circumstances a party so entering has the right to render the necessary assistance and to leave the car. A railroad so permitting him to enter with knowledge of his purpose is presumed to agree that he may execute it, and is bound to hold the train a reasonable time therefor. The duty is dependent upon the knowledge by the carrier of his purpose or by those in charge of the train. Without such knowledge, they may reasonably conclude that the entry was made for the purpose of becoming a passenger, and that the carrier may cause the train to be moved after giving time reasonably sufficient for him to get aboard.

[3] In this case the appellee does not testify or claim that he gave the brakeman, or any of the train crew, notice that he was entering to assist those in his charge. The only pretense of any verbal notice is the testimony of the brakeman on cross-examination, in which he stated that appellee answered his inquiry as to where they were going that "we," or "they, are going to Hedley." He could not remember positively whether appellee said "we" or "they." As stated above, appellee does not pretend to have given any sort of notice of his purpose in entering the car. We can see nothing in the manner in which appellee and his daughters boarded the car that would charge the train crew with knowledge that the appellee was entering to assist those accompanying him, and that he intended to leave the car upon performing that assistance. If it shall be conceded that the jury found appellee stated, "They are going to Hedley," and in doing so he referred to his daughters, this does not still charge the brakeman with knowledge that appellee was not then entering as a passenger, and that he was entering

as an assistant to his daughters, or that he intended to leave so soon as this service was performed. There being no such notice at the time of entrance, there was no duty resting upon appellant to hold the train a reasonable time to permit appellee to leave the car. Oxsher v. Railway Co., 29 Tex. Civ. App. 420, 67 S. W. 551; Railway Co. v. Satterwhite, 15 Tex. Civ. App. 102, 38 S. W. 401; Railway Co. v. Güess, 154 S. W. 1060; Dillingham v. Pierce, 31 S. W. 203; Railway Co. v. Miller, 8 Tex. Civ. App. 241, 27 S. W. 905; Railway Co. v. Hutchinson, 132 S. W. 509.

[4] There is no allegation in the petition that at the time of boarding the train by appellee the train crew then knew his purpose in entering the car, or that they had notice that he would leave; neither do we find any allegation that it was a long-continued custom of the railway at that point to permit parties accompanying a passenger to enter and render assistance and a reasonable time given in which to leave the car; and we find no evidence of such a custom. If appellee entered without notice of his purpose, there was no duty resting on appellant to hold the train a reasonable length of time to permit him to get off. If there was no custom alleged or proven in regard to assistants to passengers to enter the car during the usual and customary stop at the station, then no duty is shown on appellant to appellee to stop the train at the station the usual and customary time. If appellee had alleged and proven the custom in such particular, and if his proof had shown that the train was not stopped at the station the usual time, his right of recovery should have been submitted without proof of notice of his purpose; the custom would have supplied the notice. Railway Co. v. Hutchinson, 132 S. W. 509; Railway Co. v. Abbott, 170 S. W. 117.

[5] We find no evidence that the train schedule stop at Clarendon was five minutes to permit passengers to alight and others to board the train. The testimony of the conductor and brakeman is to the effect the time for arrival of the train at Clarendon was 8:37 a. m., and that there was no leaving time, but its departure was controlled by the business to be transacted at the time. A stop was made long enough for passengers to get on and off and to change the mail and express without regard to the number of minutes or seconds. This was the rule and custom at that station. So far as we are able to find, this testimony is undisputed. There appears to have been but few passengers to get on or off at that point on that day. Under these facts and the pleadings, the court should not have submitted the issue of negligence in failing to cause the train to remain standing a reasonable length of time to allow appellee to perform the service and leave the train in safety. The

allegation and facts proven showed no such duty owing appellee.

[6-8] The issue whether appellee was directed or invited to leave the train, and whether appellant was negligent in so doing, is also presented by appellant's special requested charge for an instructed verdict. The appellee entered the car upon his own volition, and under circumstances such as were sufficient to indicate that he did so as a passenger, and not as a mere assistant to the passengers whom he was conducting, and that he did so without giving notice to the train crew of his object or purpose. After having done so and the train started, he then informed his daughters that he must leave or disembark. He reached the platform of the vestibule and saw the brakeman and asked him if the train would stop at the coal chute. When informed that it would not, he announced that he must get off, and started down the steps and the brakeman up; they passing each other on the step. Up to this time there can be no question but appellee was acting on his own volition, without having been invited or requested thereto by the servants of appellant. He had not been invited to leave, or requested to do so, by any servant of the appellant. We know of no duty which would require the brakeman to stop or hold him. The danger was not apparent, or necessarily so, at that time. The train was moving, it is true, but just starting, and had gone but a few feet. When he reached the last step, preparatory to leaving the train, we will assume the jury found the brakeman told him to jump with the train. This statement was not a command or request by the brakeman for him to jump, but in the light of this record was advice as to the manner of the jump to be made or manner in which to leave the train while in motion. Appellee had entered with the purpose of leaving; had announced to his daughters when he felt the train move that he must go, and told the brakeman he must get off and, while telling him so, was proceeding to do so, and when he reached the last step, as he says, preparatory to the jump, he heard the instructions given by the brakeman. If he had heeded the instructions it is not probable that he would have received the injury, but he jumped at right angles to the train, or in the opposite direction, and he states positively he did not jump the way the train was going. We think it is manifest that the appellee did not rely on what the brakeman said, and did not jump because of what had been said by the brakeman; that what he did or said neither in act nor word was the inducing cause to appellee in jumping from the train. The appellant learned for the first time that appellee desired to leave the train after he reached the vestibule on his way out of the car. There appears to have been no perceptible halt made by him in leaving the car and in jump-

ing. It is urged because the brakeman gave appellee room on the steps to pass that this was a direction or invitation to jump from the train. Under the facts of this case we cannot see how it could be so construed. The brakeman was himself boarding the train as it started. There was no duty owing appellee by appellant at that time further than that which ordinary care required. To have blocked the way of appellee would have been an extraordinary proceeding after appellee declared he must get off and was proceeding to do so. He did not ask that the train be, stopped or held for that purpose. The use of the words, "jump with the train," was clearly given in the nature of information, after it was manifest appellee intended to do so. Under no construction can it be interpreted as a command or a declaration in the nature of a requirement. Pittsburgh, etc., Railway Co. v. Gray, 28 Ind. App. 588, 64 N. E. 39; Vimont v. Railway Co., 71 Iowa, 58, 32 N. W. 100. It is urged that the brakeman having failed to stop the train after he learned appellee desired to get off was negligence. This issue was not submitted to the jury by the trial court. Under the facts in this record, we see no negligence on the part of the train crew in failing to stop the train after it had started, after learning that appellee intended to leave the train. There was no duty due from appellant to appellee to stop the train. He had not given notice that he would want time in which to disembark before he entered. After learning that it was appellee's purpose to leave, and after the train was in motion, there is no fact showing that the train could have been stopped by the use of the utmost diligence before appellee had stepped off. In the absence of a request to stop, there was no duty to inquire of appellee if he wanted the train stopped—no such duty then rested on appellant—but if appellee had felt himself unskilled in the manner of alighting and was unwilling to take the risk, he should have notified the brakeman. It was not negligence on the part of appellant in simply permitting him to do what he notified the brakeman he was going to do and in carrying out his own will and purpose. He had never established a relationship between himself and the railway that placed an obligation upon it to protect him further than, after it was known his purpose was to leave the train, to use ordinary care in permitting him to do so. The brakeman appears to have given him good and wholesome advice in the matter, and it occurs to us there was no failure shown to use ordinary care on the part of appellant. Especially is this true under the immediate facts then surrounding the parties. We do not see what more the brakeman could have done, unless he had taken hold of and held appellee until he could have reached the conductor, or the stop signal. This was

not required of appellant, even if the appellee had been a passenger on the train, as we understand the authorities of this state and others.

We believe the trial court should have given the peremptory charge, and that the jury should have been instructed to return a verdict for the appellant. We see no reason for remanding the case for another trial, as it appears to have been fully developed. The case will be reversed and rendered.

---

⬥For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes ·